BEAM, Circuit Judge,
dissenting.
This two-judge court now joins a continuously expanding list of union-employ *651 er disputes from this circuit in which the presently structured National Labor Relations Board (NLRB or the Board), generally by means of its cadre of Administrative Law Judges (ALJ), seemingly reconciles facts and construes issues of law most favorably to labor-union interests. See, e.g., NLRB v. Mo. Red Quarries, Inc., 858 F.3d 920, 925 (8th Cir. 2017); Beverly Enters. v. NLRB, 148 F.3d 1042, 1045-46 (8th Cir. 1998); Schnuck Markets, Inc. v. NLRB, 961 F.2d 700, 704 (8th Cir. 1992).
Although it is difficult to discern the breadth of the NLRB’s focus in this matter from its and the ALJ’s wide-ranging emanations in its thirty-six page Decision and Order, it is unmistakably clear that the gravamen of this particular dispute is and should have been, as a matter of law, limited to the scheduling, preparation for and execution of the union members’ June 24 “informational picketing,” which exercise dealt with some members’ trepidations concerning “staffing levels” at the hospital. The interrelated informational picketing activities mentioned above were in no sense connected with earlier general or episodic use of the hospital’s several “open-to-the-public” facilities by the unions’ members. Nor did they in any way involve “self organizing” or “collective bargaining” activities as analyzed in Beth Israel Hospital v. NLRB, 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978). The picket was held at a public park adjacent to the hospital.
After an intense prior publicity campaign by the hospital’s two unions acting at all times as agents for their members, 500 picketers, including North Memorial employees, fellow union members from the reaches of Minnesota and Wisconsin, and members of the general public gathered on that date in the park for the presentation of the dissident members’ views. The Board’s Decision and Order attempts to incorporate within the unions’ complaint to the Board concerning this matter a broad range of union and management interactions occurring at various other earlier times and places. It is clear, however, that these collateral grievances are wholly irrelevant and immaterial to this particular “informational picketing” quarrel with the hospital.[2]
As noted by the court’s opinion, the sum total of the actionable facts at issue here were as follows:
On June 23, the day before the picketing, SEIU representative Frederick Anthony and MNA representative Karlton Scott planned to meet in the cafeteria and then place picket information on bulletin boards throughout the facility. Anthony arrived before Scott, purchased lunch in the cafeteria, and began eating. He had flyers about the picket in a closed folder on his table. When employees approached him to ask questions about the picketing, he gave them a flyer. Anthony did not circulate through the cafeteria or initiate conversations with anyone. When Scott arrived, he sat at Anthony’s table and began working on a laptop computer while Anthony finished eating.
While Anthony and Scott were sitting in the cafeteria, they were approached by the hospital’s director of employee and labor relations, Jeffrey Cahoon, and its labor relations representative, *652 George Wesman. Anthony was talking to an off duty employee when Cahoon and Wesman confronted him and Scott. Ca-hoon accused them of holding a meeting in the cafeteria which Anthony denied. Cahoon replied that he would consider how to respond, but the hospital might file an unfair labor practice charge against them. Anthony and Scott then left the cafeteria and began posting [picketing] information on bulletin boards throughout the facility until hospital officials had them escorted out of the building. The hospital also gave them written trespass warnings banning them from the facility for one year.
On the same day Melvin Anderson, an employee of the hospital and an SEIU steward, posted information about the picket on a bulletin board in the sterile processing and dispensing department (SPD). Hospital officials then removed the posting and told Anderson he was not allowed to post union information on the SPD bulletin board.
Ante at 643-44.
There is no evidence in the record suggesting that the hospital had a generally applicable policy or practice which [either permitted or] prohibited [union] solicitation or gathering in the cafeteria. Article 1(h) of the collective bargaining agreement (CBA) between North Memorial and SEIU states that SEIU “shall have access ... to such other nonpatient nonpublic areas to be designated by the Hospital.” The hospital has designated two nonpublic areas for SEIU to meet with employees—a few tables in the lower level of the facility below the atrium and a space off of a hallway near an underground tunnel. The CBA between North Memorial and .MNA does not discuss where MNA may interact with employees, but the hospital has designated a room on its lower level as an MNA office. Neither of the bargaining agreements mention any union right to access public spaces within the facility.
Ante at 643.
Based upon the above facts, the two unions filed charges with the NLRB alleging various violations of the National Labor Relations Act (NLRA or the Act). In turn the NLRB issued a complaint against North Memorial. This complaint specifically alleges violations of § 8(a)(1) and 8(a)(5) and (1) of the Act. 29 U.S.C. § 158. Subsection 8(a)(1) incorporates by reference § 7 of the Act, M § 157. Subsection 8(a)(5) incorporates by reference § 9(a) of the Act, id. § 159. The complaint also alleges violations of § 8(a)(3) and (1) of the Act. Subsection 8(a)(3) incorporates by reference § 9(a) and (e) of the Act.[3]
*653 Notwithstanding the Board’s complaint against North Memorial, the relevant facts *654 as outlined by the court and established by the record support absolutely no violations of the NLRA. Indeed, the Act does not seek to in any way regulate “informational picketing” on public property as occurred in this matter.
Although the ALJ and the Board accuse North Memorial of committing “unfair labor practices” in violation of 29 U.S.C. 157, neither that section (nor any other section of the Act to my knowledge) cites or explains the words “informational picketing on public property” unrelated to the right to collectively bargain or organize. See id. § 158(c)(7)(C).
Informational picketing on public property, as here, is expressive conduct within the protection of the First Amendment. Phelps-Roper v. City of Manchester, Mo., 697 F.3d 678, 686 (8th Cir. 2012). And, the communications at issue as earlier publicized, prepared for and discussed at the park in no way involved “self-organizational” privileges or “collective bargaining” rights or activities as discussed in Beth Israel. The hospital’s union members had long ago self-organized and collectively bargained for an agreement that has long been and is now fully in place. There is no record that either of these matters were in any way discussed or debated on the public property or elsewhere.
I digress briefly to note that the unions’ and their members’ communicative activity on hospital-owned private property presents a starkly different scenario. And, to be clear, every action for which the NLRB purports to penalize the hospital, occurred only on private property.
I find no statutory authorization or binding judicial precedent that transfers to the NLRB any adjudicative authority over the hospital’s communicative activity concerning these matters protected by the First Amendment. Without such authorization or precedent, the NLRB has no jurisdiction over this member-employer dispute concerning use of the hospital’s private property with regard to an informational picket.
Recently, the Supreme Court in Henson v. Santander Consumer USA Inc., — U.S. -, -, 137 S.Ct. 1718, 198 L.Ed.2d 177 (2017), buttressed this conclusion. The Court’s opinion, albeit in a slightly different context, notes that a court’s job (and I presume also an administrative agency with adjudicatory authority) is to “apply faithfully the law Congress has written” and not attempt to “replace the actual text with speculation as to Congress’ intent” as appears to be the course of action by the Board in its vastly overreaching cease and desist conclusions in this matter. Id (second passage quoting Magwood v. Patterson, 561 U.S. 320, 334, 130 S.Ct. 2788, 177 L.Ed.2d 592 (2010)).
While I concede that the hospital, through collective bargaining under the auspices of the NLRA, could have contractually agreed to a more generous use of the hospital’s private property, it did not do so. As earlier noted, the collective bargaining agreement clearly designated only two nonpublic areas for the SEIU to meet employees—a few tables in the lower level of the facility below the atrium and a space off a hallway near a ground tunnel—and a room on its lower level for use as an MNA office. As also earlier noted, neither bargaining agreement mentions any right for either union to access any “open-to-the-public” space within the facility to conduct union business.
In this case, the unions and the Board adopt the unsupportable stance that all of the hospital’s “open-to-the public” facilities are substantially available for the unions’ person-to-person interaction and communication with their membership. Indeed, in its Decision and Order, the Board de *655 mands that North Memorial shall “cease and desist” from limiting any measure of the unions’ use and activity on such property, thus giving the unions unfettered use of hospital facilities that are in any way “open to the general public” or designated as “public areas,” or' referenced as for public use. Indeed, the Decision and Order repeats these broad ranging cease and desist prohibitions in various ways multiple times. Thus, the Decision and Order’s “public area” references would include, in addition to the hospital’s cafeteria, any publicly available family visiting or waiting rooms, publicly accessible gift shops, snack bars or vending areas, publicly accessible toilet facilities, public stairways, public lobbies of any description or location, bulletin boards visible to public viewing and, perhaps, the hospital’s parking lots.
I concede that in Beth Israel, the Supreme Court substantially opened lines of use and communication in nonworking hospital areas when the activity is strictly dedicated to “the right of employees to self-organize and bargain collectively.” 437 U.S. at 491, 98 S.Ct. 2463. But, in doing so, the Court also determined that the NLRB must adjust “the undisputed right of self-organization assured to employees under [Section 7 of the NLRA] and the equally undisputed right of employers to maintain discipline in their establishments.” Id. at 492, 98 S.Ct. 2463 (quoting Republic Aviation Corp. v. NLRB, 324 U.S. 793, 797-98, 65 S.Ct. 982, 89 L.Ed. 1372 (1945)). Accordingly, the almost unlimited breadth and depth of the Board’s order in this case arising only from an informational, First Amendment-authorized picketing dispute is unprecedented and erroneous.
At the bottom line, this case is controlled by this circuit’s holdings in Baptist Medical System v. NLRB, 876 F.2d 661 (8th Cir. 1989). Therein, the court, recognizing only the “self-organization” rights enumerated in NLRB v. Babcock & Wilcox Co, 351 U.S. 105, 113, 76 S.Ct. 679, 100 L.Ed. 975 (1956), and the “collective bargaining” prerogatives outlined in Beth Israel, states “[b]y inviting the public to use an area of its property, the employer does not surrender its right to control the uses to which that area is put.” Baptist Med., 876 F.2d at 664.
Based upon the above-stated precedent, these seriously overreaching edicts by the NLRB on behalf of self-aggrandizing labor unions indelibly portray biased and mistaken decisions. In sum, the Board has turned established precedent on its head. Without the benefit of a collectively bargained agreement providing this incredible access, the Board’s orders are simply unenforceable.
The Board’s Decision and Order should be reversed and the unions’ complaints dismissed.
Accordingly, I dissent.

. The ALJ and NLRB erroneously contend that these earlier interactions, mostly consisting of violations of the existing collective bargaining agreement (CBA) by union employees and members, somehow served to amend the terms and conditions of the earlier agreed upon CBA, making the CBA more favorable to the unions and their members. These contentions are frivolous both as a matter of law and fact.

. The applicable sections of the NLRA are:
Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.
29 U.S.C. § 157.
(a) Unfair labor practices by employer
It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
[[Image here]]
(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this subchap-ter, or in any other statute of the *653 United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: Provided further, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;
[[Image here]]
(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
(b) Unfair labor practices by labor organization
It shall be an unfair labor practice for a labor organization or its agents—
[[Image here]]
(5) to require of employees covered by an agreement authorized under subsection (a)(3) of this section the payment, as a condition precedent to becoming a member of such organization, of a fee in an amount which the Board finds excessive or discriminatory under all the circumstances. In making such a finding, the Board shall consider, among other relevant factors, the practices and customs of labor organizations in the particular industry, and the wages currently paid to the employees affected;
[[Image here]]
29U.S.C. § 158.
(a) Exclusive representatives; employees’ adjustment of grievances directly with employer
Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: Provided further, That the bargaining representative has been given opportunity to be present at such adjustment.
[[Image here]]
(e) Secret bállot; limitation of elections
(1) Upon the filing with the Board, by 30 per centum or more of the employees in a bargaining unit covered by an agreement between their employer and a labor organization made pursuant to section 158(a)(3) of this title, of a petition alleging they desire that such authority be rescinded, the Board shall take a secret ballot of the employees in such unit and certify the results thereof to such labor organization and to the employer.
[[Image here]]
29 U.S.C. § 159.