# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

August 6, 2018

Lyle W. Cayce
Clerk

No. 17-50613

———————

HEBBRONVILLE LONE STAR RENTALS, L.L.C.; SAMUEL G. LOVETT;
LESLIE M. LOVETT,

Plaintiffs - Appellees

v.

SUNBELT RENTALS INDUSTRIAL SERVICES, L.L.C.,

Defendant - Appellant

———————

Appeal from the United States District Court
for the Western District of Texas

———————

Before HIGGINBOTHAM, DENNIS, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

Hebbronville Lone Star Rentals, L.L.C. sold its assets, customer lists, and customer contracts to another equipment rental business, Sunbelt Rentals Industrial Services, L.L.C. The sales price included a $25 million upfront payment as well as three future contingent payments sometimes called earnouts. The idea behind the contingent payments was to incentivize the owner of Lone Star, Sam Lovett, to help Sunbelt retain and grow the revenue from Lone Star's customer base. The more business Sunbelt received from former Lone Star customers, the higher the contingent payments would be. The agreement provided a mechanism for Sunbelt to calculate this figure. If

No. 17-50613

Lone Star disagreed with the figure, it could propose an adjustment. Such a dispute arose, so the parties invoked their agreement for an arbitrator to resolve the "dispute over Seller's proposed adjustments to [the] Revenue Calculation." The arbitrator agreed with Lone Star's upward judgment to the revenue attributable to its former customers. But he did something else. He reformed the contract after concluding that the parties had made a mutual mistake when their agreement listed the revenue target for the former Lone Star clients. We decide whether the arbitrator had this authority to reform the parties' agreement.

I.

This dispute involves the first contingency payment. In the words of the "earnout" name this pricing structure is sometimes given, the seller has to earn these future payments based on the revenues the buyer realizes from the purchase. So a contingency payment is due only if Sunbelt's revenues from certain preclosing customers of Lone Star during the nine-month period meet or exceed a target. The agreement refers to the target as the "Threshold" or "Contingent Payment Threshold." The threshold is $36,265,141.50 for the first contingency period. The parties arrived at that number by adding Lone Star's and Sunbelt's preclosing revenues for specified "Business Customers" of Lone Star. If the revenues from these customers for the first contingency period meet or exceed the threshold, Sunbelt pays Lone Star an additional $7 million. If revenue meets at least 90% of the threshold, Lone Star receives the corresponding percentage of the contingency payment. In other words, if revenue comes in at 94% of the target, Sunbelt pays Lone Star 94% of the $7 million. If, however, revenues are less than 90% of the threshold, Lone Star is shut out; no contingent payment is due.

No. 17-50613

Soon after the end of the first contingency period, Sunbelt sent its revenue calculation to Lone Star. It concluded that revenues came in $1.3 million below the critical 90%.

Lone Star disagreed, arguing that Sunbelt had omitted revenue for two customers. For the first customer, COG Operating LLC, Sunbelt had excluded more than $2 million from its revenue calculation on the ground that some of its accounts listed COG under a slightly different name—COG Operating, LLC. If you missed the difference, it is the existence of a comma prior to "LLC." Sunbelt included the revenues of COG-without-a-comma, which were negligible at a little under $55,000, but not the much greater revenues of COG-with-a-comma. Sunbelt justified that exclusion on the ground that the asset purchase agreement does not list COG-with-a-comma as a Business Customer. Lone Star pointed out in response that, despite the slightly different names, there is one COG company with a single invoicing address that refers to itself both as COG-with-a-comma and COG-without-a-comma. Sunbelt also raised an alternative argument to support the exclusion: because its presale revenues for COG-with-a-comma had not been included in calculating the Threshold Amount, revenues corresponding to the same account should not be included in calculating revenues during the contingency period.

For the second customer, BHP Billiton, Sunbelt had completely excluded its revenues. Lone Star objected, as BHP had recently acquired Petrohawk Energy LLC, and Petrohawk was an identified Business Customer. So Lone Star argued that the BHP Billiton revenues attributable to the former Petrohawk entity should have been included.

After Lone Star sought these adjustments, the parties were unable to resolve the dispute and submitted it to an accounting firm per an arbitration clause in their agreement. The engagement letter stated that the arbitrator was to resolve "their disagreement as to whether the threshold amount for the

3

## No. 17-50613

first Contingent Payment Period has been met, and, if the threshold amount has been met, the amount of the First Contingent Payment."

The first part of the arbitrator's decision is unchallenged in this lawsuit. He agreed with Lone Star that COG is a single entity, so concluded that revenue from the accounts under both names, with and without a comma, should be included in revenue.[1] He also held that the revenue should include the percentage of BHP revenues attributable to Petrohawk. With these changes, the total revenue from Business Customers for the first period rose above the 90% mark to $34,820,837.22. Had the decision ended there, Lone Star would have been entitled to a payment of $6,440,000.

But the new revenue calculation did not end the arbitration. The arbitrator reasoned that "one of the 'remaining dispute[s]' under Section 3.5 of the Agreement is whether the Contingent Payment Threshold has been met. That question necessarily turns on whether Section 3.5(a) . . . can be reformed due to mutual mistake of the Parties." He then found that the parties made a mutual mistake in calculating the threshold without including revenues of COG Operating LLC. Because the parties intended the threshold to be the twelve-month trailing revenues of all the identified customers, the arbitrator concluded that the revenues from COG-with-a-comma should have been included in the threshold.[2] Otherwise, the arbitrator explained, Lone Star would receive a "windfall" because the Sunbelt accounts for COG-with-a-comma would be included in the postacquisition revenue but not the preacquisition revenue. He believed that result was inconsistent with the parties' intention for a comparison of the pre- and postsale revenue for the

---

[1] As to the revenue attributable to COG-with-a-comma, the arbitrator agreed with Sunbelt that it was $2,046,846.48 rather than the higher figure Lone Star sought.

[2] Lone Star's preacquisition revenues for COG-with-a-comma, which were negligible at $40,918, were included in the threshold amount. But Sunbelt's much greater preacquisition revenues listed under that account name ($4.5 million) were not.

No. 17-50613

same customers.    Reforming  the  agreement  to  fix  the  mutual  mistake increased the threshold for the first period to $39,606,349.  This meant that even the adjusted revenue from the first period represented only 88% of the reformed threshold amount, so no payment was due.

Lone Star sued in federal court seeking (1) to confirm the part of the arbitration award that agreed with its revenue adjustment, but (2) to vacate the reformation of the contract which resulted in the new threshold.  The district court, adopting the recommendation of a magistrate judge, agreed with Lone Star on both counts.  As to the latter issue that is the sole one on appeal, the court found that the arbitrator had exceeded his limited authority in deciding Sunbelt's claim of mutual mistake.

## II.

Whatever the outcome of this appeal, someone will decide the question of mutual mistake.  If we affirm the district court and vacate the arbitrator's reformation, Sunbelt has filed a counterclaim in district court asking it to decide whether the parties made a mutual mistake.  So this appeal involves only the issue of who will decide, not what will be decided.  But the question of who decides—which we often see in the form of a choice between a federal or state court, a federal court in one district versus another, or this question of an arbitrator or a court—can be as hotly disputed as the merits of a case.  That is the case here.

Whether an arbitrator is the one who decides is a matter of contract. *First Option of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (explaining that arbitration is "simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration"); *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648–49 (1986) ("[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit

5

such grievances to arbitration."). When parties enter into an arbitration agreement, there is a presumption that the clause covers a dispute because of the policy favoring arbitration that courts have attributed to the Federal Arbitration Act. *AT&T Techs.*, 475 U.S. at 650; *Hous. Ref., L.P. v. United Steel, Paper & Forestry, Rubber, Mfg.*, 765 F.3d 396, 412 (5th Cir. 2014). But as with all issues of contract interpretation, unambiguous language controls when the question is the scope of an arbitrator's power. *Smith v. Transp. Workers Union of Am., AFL-CIO Air Transport Local 556,* 374 F.3d 372, 375 (5th Cir. 2004). The principle that arbitration clauses should be read broadly thus applies, like other tiebreaking rules of contract interpretation, when there are "[d]oubts" about coverage. *AT&T Techs.*, 475 U.S. at 650. "[T]he policy that favors resolving doubts in favor of arbitration 'cannot serve to stretch a contractual clause beyond the scope intended by the parties . . . .'" *Smith*, 374 F.3d at 375.

That stretching occurred here as the relevant arbitration clause is limited to a "dispute over Seller's proposed adjustments" to the Revenue Calculation. Here is Section 3.5 of the asset purchase agreement in its entirety:

> Buyer and Seller will negotiate in good faith to resolve any dispute over Seller's proposed adjustments to a Revenue Calculation, provided that if any such dispute is not resolved within twenty (20) days following receipt by Buyer of the proposed adjustments, Buyer and Seller jointly will select the Accounting Firm to resolve any remaining dispute over Seller's proposed adjustments in accordance with this Agreement, which resolution will be final; provided, however, the Accounting Firm will not be entitled to resolve any dispute regarding the existence of New Customers or Growth Customers. Buyer shall provide the Accounting Firm with access to the Books and Records of the Buyer Business necessary to enable the Accounting Firm to complete its assignment. The Accounting Firm will be instructed to deliver its written determination within thirty (30) days. The Accounting Firm will address only those items in dispute and may not assign a value greater than the greatest value for such item claimed by either

party or smaller than the smallest value for such item claimed by either party. The fees and expenses of the Accounting Firm will be shared by the parties equally.

Various features of this clause show it is limited to the first part of what the arbitrator did: resolving the parties' dispute about the Revenue Calculation. First, Section 3.5 refers only to the revenue calculation, it says nothing about the threshold amount. Unlike the revenue calculation, which as a future event was one the parties anticipated might be disputed, the threshold amount is an exact figure defined earlier in the agreement and thus not contemplated for reexamination. Even with respect to the Revenue Calculation, Section 3.5 does not allow for full-scale reconstruction. The arbitrator is to resolve only "any remaining dispute over *Seller's proposed adjustments* to a Revenue Calculation" (emphasis added).[3] Because only Lone Star's disagreement with Sunbelt's Revenue Calculation can give rise to a Section 3.5 arbitration, Sunbelt surely could not have used that clause to seek arbitration of its reformation claim had the parties agreed on revenue. We do not see why that door is opened because Lone Star disputed the revenue calculation.

Other courts examining similar arbitration provisions have reached the same conclusion about their limited scope. The Sixth Circuit recently read a clause requiring arbitration of any "Disagreement with [an] Earn-out Statement" to mean "the parties agreed to arbitrate only disputes over the *calculation* of the Earn-out Payments; they did not agree to arbitrate *all* disputes between the parties that might somehow affect Biscayne's

---

[3] In identifying his authority to decide reformation, the arbitrator quoted the language that comes later in Section 3.5(c) discussing the selection of an accounting firm "to resolve any remaining dispute over Seller's proposed adjustments." This reasoning overlooked that the dispute submitted to arbitration must be the type mentioned at the beginning of the clause: one "over Seller's proposed adjustments *to a Revenue Calculation*."

entitlement to Earn-out Payments." *Smith v. Altisource Sols.*, 726 F. App'x 384, 391 (6th Cir. 2018); *see also Bratt Enterprises, Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 611–13 (6th Cir. 2003) (not allowing arbitrator to decide breach of contract and related mistake claim when the arbitration agreement only covered disagreements about "amounts included in the Closing Balance Sheet"); *Orrico v. Alliant Foodservice, Inc.*, 119 F. App'x 899, 902 (9th Cir. 2004) (holding that arbitration provision only extended to calculation of earnout payment and not damages for breach of contract). *Pureworks, Inc. v. Unique Software Solutions, Inc.*, 554 F. App'x 376 (6th Cir. 2014), on which Sunbelt relies, involved a broader arbitration clause than these cases and ours. The *Pureworks* agreement "provided broadly for arbitration of 'disputes regarding the [e]arn-out [r]eport,'" so the court concluded that arbitration was required for "operational disagreements *affecting* the earn-out report." *Id.* at 378. Section 3.5 of the Lone Star-Sunbelt agreement does not extend to any dispute "regarding," or to use another broad term "arising out of," the Revenue Calculation; it covers only a "dispute over *Seller's proposed adjustments* to a Revenue Calculation." *See Smith*, 726 F. App'x at 392 (distinguishing *Pureworks* because of the broad "regarding" language).

Looking to the asset purchase agreement as a whole reinforces the limited nature of a Section 3.5 arbitration. The agreement has three other arbitration clauses, each of which covers disputes arising from other postclosing accounting responsibilities of the parties.[4] The agreement (Section 9.10) then provides that any disputes not falling within the scope of the four arbitration clauses will be resolved in court:

---

[4] Section 3.3 provides for arbitration of "any dispute over Seller's proposed adjustments to Buyer's Closing Computations." Section 3.4 provides for arbitration "of any dispute over Seller's proposed adjustments to the [Closing Date Accounts Receivable and the Earned Not Billed Revenues]." Section 3.6 provides for arbitration to "finalize the allocation of the Purchase Price among the Acquired Assets."

Except for disputes resolved as set forth in Sections 3.3, 3.4, 3.5 and 3.6, the Parties hereby irrevocably submit to the exclusive jurisdiction of the federal or state courts of the State of Texas over any Proceeding arising out of or relating to this Agreement or any of the Transactions and each Party hereby irrevocably agrees that all claims in respect of such Proceeding may be heard and determined in such courts. The Parties hereby irrevocably waive any objection which they may now or hereafter have to the laying of venue of any Proceeding brought in such courts or any claim that such Proceeding brought in such courts has been brought in an inconvenient forum.

Sunbelt tries to minimize the role of this clause, classifying it as nothing more than a forum selection clause.  It is true that even an all-encompassing arbitration clause may coexist with a forum selection clause.  "[L]awsuits often precede arbitration (when a court may be asked to decide the validity, scope, and enforceability of an arbitration clause) or follow arbitration (when a court may be asked to enforce or set aside an arbitration award)," so selecting a judicial forum does not negate an intent to arbitrate.  *Sharpe v. AmeriPlan Corp.*, 769 F.3d 909, 916 (5th Cir. 2014).  But Section 9.10 goes well beyond the standard forum-selection clause.  *Id.* (contrasting a clause like Section 9.10 in which the parties agreed to "irrevocably submit[] to the non-exclusive jurisdiction" of state and federal courts with a simple forum selection agreement that "any action brought on matters related to this Agreement shall be maintained in Dallas").  It is an agreement that other than the four types of disputes subject to arbitration, courts in Texas will resolve disputes "arising out of or relating to this Agreement."  That is much broader language than the four discrete arbitration clauses.  The district court correctly treated Sunbelt's reformation argument, which seeks a significant rewriting of the parties' agreement, as such a claim "relating to" the Agreement that should be resolved in court.

No. 17-50613

III.

Even if the arbitration clause in Section 3.5 was not an agreement to have the accounting firm decide reformation, Sunbelt contends that the engagement letter was.  Because arbitration is just a matter of the parties' agreement, that meeting of the minds can also take place when the parties submit the dispute to the arbitrator.  *Executone Inform. Sys., v. Davis*, 26 F.3d 1314, 1323 (5th Cir. 1994); *Piggly Wiggly Operators' Warehouse, Inc. v. Piggly Wiggly Operators' Warehouse Indep. Truck Drivers Union, Local No. 1*, 611 F.2d 580, 584 (5th Cir. 1980).  Submission letters, like other agreements to arbitrate, should be given a broad construction.  1 DOMKE ON COMMERCIAL ARBITRATION § 8:4.  Indeed, at oral argument Sunbelt emphasized the letter over the contract as the source of the arbitrator's power to reform.

This is what the relevant part of the engagement letter said:

> [T]he Parties are submitting to the Arbitrator, for resolution, their disagreement as to whether the threshold amount for the first Contingent Payment Period has been met, and, if the threshold amount has been met, the amount of the First Contingent Payment.

Sunbelt latches onto the reference to "whether the threshold amount for the first Contingent Payment Period has been met," which it contends requires figuring out what the threshold amount should be.  It notes that "threshold" is lower case, in contrast to the defined term "Contingent Payment Threshold."  But it puts too much weight on the lower-case "t" to read it as giving the arbitrator discretion to recompute the threshold rather than as a shorthand reference to the amount the parties agreed to.  The engagement letter asks the arbitrator to decide not what the threshold amount should be, but whether it "has been met."

The arbitration procedures detailed in the engagement letter are also inconsistent with Sunbelt's view that it expanded the scope of that proceeding

10

beyond what the parties agreed to in the asset purchase agreement. The parties provided the accounting firm only with access to the financial books and records necessary to calculate revenue. The engagement letter provided for no discovery except for the production of certain invoices in connection with the threshold amount and any documentation reasonably requested by the arbitrator. And there would be no witnesses at the arbitration hearing, which itself was optional. None of these procedures reflects that the parties contemplated a decision about mutual mistake, which is a fact-intensive inquiry often requiring testimony from those who negotiated the contract. *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990). The arbitrator recognized that a claim of mistake allows for consideration of parol evidence, and considered drafts of the parties' agreements. But allowing evidence beyond the contract itself would also typically include testimony which the arbitration did not permit.

The final indication that the parties did not ask the arbitrator to decide reformation is the consequence of that decision. The engagement letter repeatedly limits the dispute to the calculation of the "First Contingent Payment." But the finding of mutual mistake would seemingly impact the second and third payments; reformation would also increase the threshold for those later periods to include the accidentally omitted COG revenues. We do not find any shared intent of the parties to allow an arbitrator to make the reformation decision that has significance beyond resolving Lone Star's disagreement with the revenue calculation for the first period.

\* \* \*

Because the parties did not agree in either the asset purchase agreement or the engagement letter to have the arbitrator decide reformation, a court must decide that issue. The judgment of the district court is AFFIRMED and the case is REMANDED for consideration of the mutual mistake claim.

11