# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
March 15, 2019

Lyle W. Cayce
Clerk

————

No. 17-50852

————

PAPALOTE CREEK II, L.L.C., formerly known as Papalote Creek Windfarm II, L.L.C.,

      Plaintiff–Appellant,

v.

LOWER COLORADO RIVER AUTHORITY,

      Defendant–Appellee.

————————

Appeal from the United States District Court
for the Western District of Texas

————————

Before HIGGINBOTHAM, ELROD, and HO, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Papalote Creek II, LLC (Papalote) appeals the district court's order compelling Papalote to arbitrate a dispute raised by Lower Colorado River Authority (LCRA)—whether their contractual agreement limits LCRA's liability to $60 million. The arbitration clause requires Papalote and LCRA to arbitrate "any dispute [that] arises with respect to either [p]arty's performance." Because the dispute that LCRA has raised is an interpretative dispute—not a performance dispute—we reverse and remand.

No. 17-50852

## I.

This is the second time Papalote and LCRA have appeared before us. *See Lower Colo. River Auth. v. Papalote Creek II, LLC*, 858 F.3d 916 (5th Cir. 2017) (*Papalote I*). In the previous appeal, we vacated the district court's order compelling arbitration on ripeness grounds without addressing whether LCRA's dispute is arbitrable. *Id.* at 918. This case has returned to us with subsequent procedural development after the remand. We summarized the relevant facts in *Papalote I*:

> In December 2009, LCRA entered into a Power Purchase Agreement [(Agreement)] with [Papalote]. Papalote planned to build an 87-turbine wind farm in Texas . . . , and under the [Agreement], LCRA agreed to purchase all of the energy . . . at a fixed price for an 18-year term.
>
> Relevant to this appeal are four sections of the [Agreement]: § 4.3, § 9.3, § 13.1, and § 13.2. First, § 4.3, which is entitled "Liquidated Damages Due to [LCRA's] Failure to Take," provides a formula for how to calculate the liquidated damages that LCRA would owe to Papalote in the event that LCRA failed to take all of the Project's energy. As noted above, LCRA is required to take all of the energy generated by the Project. However, should LCRA fail to do so, § 4.3 details how to calculate Papalote's "exclusive remedy" of liquidated damages. This liquidated damages calculation would depend in part on the difference between the [Agreement's] fixed price and the price that Papalote is otherwise able to obtain in selling the energy.
>
> Second, § 9.3, which is entitled "Limitation on Damages for Certain Types of Failures," provides the following: [Papalote's] aggregate *liability* for [its failure to construct and operate the wind farm by the agreed-upon date] shall be limited in the aggregate to sixty million dollars ($60,000,000). [LCRA's] *damages* for failure to perform its material obligations under [the Agreement] shall likewise be limited in the aggregate to sixty million dollars ($60,000,000). . . .
>
> Finally, § 13.1 and § 13.2 provide a two-step arbitration procedure. The first step, as dictated in § 13.1, requires, inter alia, that "[i]f

2

No. 17-50852

any dispute arises with respect to either Party's performance hereunder," the senior officers of LCRA and Papalote meet in an attempt to resolve the dispute. Under the second step, as outlined in § 13.2, if the dispute is not resolved through the first step within a certain timeframe, either party may submit that dispute "to binding arbitration[.]" . . .

Papalote completed construction of the Project in 2010, and in the ensuing years, LCRA complied with its obligations under the [Agreement] by purchasing all of the energy generated by the Project. In April 2015, however, LCRA initiated discussions with Papalote regarding the [Agreement]. . . . [I]n June 2015, LCRA sent Papalote a letter stating that, pursuant to § 13.2, LCRA was "initiat[ing] the arbitration process to resolve the dispute between LCRA and Papalote regarding LCRA's limitation of liability under the [Agreement] and its impact on LCRA's performance obligations." LCRA also noted that it "intends to continue to fully perform its obligations under the [Agreement] during this arbitration process." . . . Papalote rejected LCRA's request to proceed to arbitration, reasoning that "[a]n academic question about the damages LCRA might owe for a hypothetical breach simply does not constitute a 'dispute' that is proper for arbitration under the [Agreement]." Papalote also argued that a dispute over LCRA's potential liability limitation was not covered by the arbitration provision in the PPA, which was limited to disputes regarding performance obligations.

Following Papalote's refusal to arbitrate, LCRA filed a petition to compel arbitration in Texas state court on June 30, 2015. Papalote timely removed the petition to federal district court on the basis of diversity jurisdiction. . . . In February 2016, the district court granted LCRA's petition to compel arbitration. . . . [T]he district court framed the question as "whether the dispute LCRA seeks to arbitrate—whether or not LCRA's liability would be capped at $60 million in the event it elected to purchase from Papalote less than the total amount of energy it contracted to buy—qualifies as a dispute 'with respect to either Party's performance' under the [Agreement]." In answering that question, the district court recognized that, "in a certain sense, one could understand 'performance' to concern only those promises which were the essence of the [Agreement]—the sale and production of wind energy—and conceptualize the buyer's obligation to pay for failing

No. 17-50852

to take as compensation for its failure to perform, rather than as an independent performance obligation." The district court reasoned, however, that 'the better view here . . . is that LCRA's bargained-for-obligation to pay Papalote a specified sum if LCRA takes less than all of the energy produced is itself a performance obligation under the [Agreement]."

*Id.* at 919–20.

Although Papalote appealed the order compelling arbitration, the district court denied a stay of arbitration pending appeal. *Id.* at 921 n.2. Papalote, however, did not appeal the denial of a stay pending appeal; instead, on June 1, 2016, Papalote and LCRA submitted to us a "Joint Motion to Abate Appeal Without Prejudice to Automatic Reinstatement" to allow the parties to fully arbitrate. After we stayed the appeal, the parties arbitrated their dispute, and on June 28, 2016, the arbitrator issued a decision in LCRA's favor, stating that § 9.3 of the Agreement limits LCRA's liability to $60 million. After the arbitrator's adverse decision, Papalote moved to reinstate the appeal, which we granted. In addition to seeking the reinstatement of the appeal, Papalote also initiated a separate suit in the district court by filing a motion to vacate the arbitration award. The district court stayed the proceedings for Papalote's motion to vacate the arbitration award pending the appeal of the initial order compelling arbitration. While the appeal was pending, "[o]n October 10, 2016, LCRA notified Papalote that it would cease taking energy under the [Agreement] beginning on October 12, 2016, and that its resulting liquidated damages would be capped at $60 million per § 9.3." *Id.*

In the previous appeal, Papalote argued that LCRA's dispute: (1) was not ripe when the district court compelled arbitration; and (2) was outside the scope of the arbitration clause. We agreed with Papalote that the dispute was not ripe because LCRA was still taking energy from Papalote when the district court compelled arbitration. *Id.* at 927. In holding so, we concluded that

4

No. 17-50852

LCRA's subsequent decision to cease taking energy after the district court compelled arbitration could not "retroactively cure the void order compelling Papalote to an arbitration that it should not have been forced to attend at the time." *Id.* Accordingly, we vacated the order compelling arbitration and remanded without addressing the arbitrability issue. *Id.* n.6.

On remand, the district court dismissed LCRA's initial suit concerning its petition to compel arbitration. In Papalote's separate suit to vacate the arbitration award, the district court lifted the stay, and LCRA filed a cross-motion to affirm the arbitration award and, alternatively, to compel another arbitration. Consistent with this court's judgment in *Papalote I*, the district court vacated the arbitration award as it was the fruit of an order that the district court had entered without subject matter jurisdiction. However, holding that the dispute was now ripe and again concluding that the dispute fell within the scope of the arbitration clause, the district court once again compelled arbitration. Papalote appeals, contending that LCRA's dispute is outside of the scope of the arbitration clause.

## II.

## A.

We review *de novo* whether the district court properly compelled arbitration. *Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 608 (5th Cir. 2016). We begin with "the proper framework for deciding when disputes are arbitrable." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010). "Under that framework, a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *Id.*; *see also id.* at 304 n.11 ("The test for arbitrability remains whether the parties consented to arbitrate the dispute in question."). This framework "involves two questions: '(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls

within the scope of that arbitration agreement.' " *Gross v. GGNSC Southaven, LLC*, 817 F.3d 169, 176 (5th Cir. 2016) (quoting *Tittle v. Enron Corp.*, 463 F.3d 410, 418 (5th Cir. 2006)). Because neither Papalote nor LCRA disputes the validity of the Agreement's arbitration clause, this appeal concerns only whether LCRA's dispute falls within the scope of that arbitration clause.

Determining the scope of an arbitration clause is a matter of contract. *Hebbronville Lone Star Rentals, LLC v. Sunbelt Rentals Indus. Servs., LLC*, 898 F.3d 629, 632 (5th Cir. 2018); *see also First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (observing that arbitration is "simply a matter of contract" and "a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration"). Under Texas law, the primary object of contract interpretation "is to ascertain and give effect to the intent of the parties as that intent is expressed in the contract." *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). Although both federal law and Texas law create a presumption in favor of arbitrability, "unambiguous language controls when the question is the scope of an arbitrator's power," and the "policy that favors resolving doubts in favor of arbitration 'cannot serve to stretch a contractual clause beyond the scope intended by the parties.' " *Hebbronville Lone Star Rentals*, 898 F.3d at 632–33 (quoting *Smith v. Transp. Workers Union of Am., AFL-CIO Air Transp. Local 556*, 374 F.3d 372, 375 (5th Cir. 2004)); *see also G.T. Leach Builders, LLC v. Sapphire V.P., L.P.*, 458 S.W.3d 502, 521 (Tex. 2015) (discussing presumption of arbitrability under Texas law).

The parties may agree upon a broad language in the arbitration clause either by incorporating "[t]he standard broad arbitration provision recommended by the American Arbitration Association" or by creating their own broad provision. *United Offshore Co. v. So. Deepwater Pipeline Co.*, 899 F.2d 405, 409 (5th Cir. 1990). These standard arbitration provisions typically

require arbitration of "[a]ny controversy or claim arising out of or relating to [the] contract" or "any dispute . . . with respect to the *interpretation or performance*." *Id.* at 409–10 (emphasis added) (quoting *Mar-Len of La., Inc. v. Parsons-Gilbane*, 773 F.2d 633, 634 (5th Cir. 1985)). "[W]hen parties choose such broad language, only . . . 'the most forceful evidence of a purpose to exclude the claim from arbitration' would render the dispute non-arbitrable." *Id.* (quoting *Mar-Len*, 773 F.2d at 636).

Alternatively, the parties may agree upon a narrow language in the arbitration clause by deviating from the broad standard provisions and by limiting arbitration only to a subset of disputes that may arise out of the contract. *See United Offshore*, 374 F.3d at 410; *see also Texaco, Inc. v. Am. Trading Transp. Co.*, 644 F.2d 1152, 1154 (5th Cir. 1981) (relying on "more restrictive language limiting arbitration" in declining to compel arbitration). For example, the parties may limit arbitration to either interpretation-related disputes or performance-based disputes at the exclusion of other categories of disputes. *Negrin v. Kalina*, No. 09-Civ-6234, 2010 WL 2816809, at *5 (S.D.N.Y. July 15, 2010) ("The parties' use of precise language in the arbitration clause suggests an intent to limit arbitration to a particular subset of disputes."); *see also Taylor v. Inv'rs Assocs., Inc.*, 29 F.3d 211, 215 (5th Cir. 1994) (applying *expressio unius est exclusio alterius* to limit the arbitration clause's application to a subset of parties).

We have previously observed that if an arbitration clause "restricts [the arbitrator's] power to an interpretation of the contract, it leaves the arbitrator powerless to decide matters on which the agreement is silent." *United Offshore*, 899 F.3d at 410. In *Beckham v. William Bayley Co.*, a contract for delivery of "standard" insect screens required arbitration of "[a]ny disagreement . . . *as to the intent of [the] contract*"—*i.e.*, interpretation of the contract. 655 F. Supp. 288, 291 (N.D. Tex. 1987). "Had the parties disputed

whether the screens, as delivered, were in fact 'standard' screens, the arbitration clause would have required that the intent as to the meaning of the term 'standard' be resolved by arbitration." *Id.* But the parties agreed on what "standard" insect screens meant, and the dispute was simply over whether the delivered insect screens were damaged. *Id.* Because such a dispute concerned *performance*, the court held that the dispute fell outside the scope of the arbitration clause. *Id.*

The opposite is also true: If the arbitration clause limits arbitration to performance-related disputes, then the arbitrator cannot decide other matters, such as interpretative disputes. *Cf. Negrin*, 2010 WL 2816809, at *6 (holding that "[t]he arbitration clause cover[ing] disputes relating to 'non-performance'" did not apply when there was no allegation that "[d]efendants failed to discharge . . . any obligation under the [contract]"). The Seventh Circuit has illustrated this distinction:

> We can imagine a case in which both parties agree that for example some form of notice is a condition precedent to performance, and the only dispute is over whether the notice was given. That dispute would be arbitrable if the arbitration clause included performance disputes, not if it did not.

*Selcke v. New England Ins. Co.*, 995 F.2d 688, 690 (7th Cir. 1993). Thus, the parties may decide what disputes they wish to submit to an arbitrator. If they limit arbitration to a specific category of disputes, at the exclusion of other categories of disputes, then the arbitrator's power is limited to those disputes to which the parties expressly consented. *See First Options*, 514 U.S. at 943.

Here, Papalote and LCRA agreed to submit to binding arbitration "[i]f any dispute arises with respect to either Party's performance." This clause clearly signifies the parties' intent to limit arbitration to performance-related disputes only, and the arbitration clause neither requires nor authorizes

No. 17-50852

arbitration of disputes that are not performance-related disputes, such as disputes related to the interpretation of the Agreement.

B.

Because the Agreement limits arbitration to "any dispute [that] arises with respect to either Party's performance," LCRA's dispute—whether the Agreement limits LCRA's liability to $60 million—is arbitrable only if it constitutes a dispute with respect to either LCRA's or Papalote's performance. We hold that LCRA's dispute is a dispute related to the interpretation of the Agreement, not a performance-related dispute, and thus does not fall within the scope of the Agreement's arbitration clause.

Interpretative disputes arise when the parties disagree over a text's meaning. *See Interpretation, Black's Law Dictionary* (10th ed. 2014) ("The ascertainment of a text's meaning[.]"). Here, LCRA's own demand letter to Papalote frames LCRA's dispute as an interpretative dispute: The letter states that "[t]he dispute is whether LCRA's liability is limited to $60,000,000 under the [Agreement's § 9.3]." And even LCRA's brief on appeal observes that this dispute is "about the *meaning* of the [Agreement's] liability limitation." LCRA's Br. at 35 (emphasis added).

As Papalote points out, one needs only to examine the Agreement to determine what the Agreement says and means, and what LCRA and Papalote had intended while drafting the Agreement. *See Selcke*, 995 F.2d at 690. The issue in this case can be answered without any reference to factual allegations of failure to perform. *See Negrin*, 2010 WL 2816809, at \*6. Accordingly, LCRA's dispute is squarely in the realm of interpretation.[1] *See also Papalote*

---

[1] We are not alone in making this observation. The previous panel of this court has made similar observations—albeit in dictum—that this dispute revolved around interpretation. *See Papalote I*, 858 F.3d at 924. So did the district court. Although the district court ultimately concluded that this interpretative dispute *related to* performance, thus constituting a performance-based dispute—a conclusion that we reject today—it could

*I*, 858 F.3d at 924 (noting in dicta that "the underlying claim that LCRA sought to arbitrate is effectively one for a declaratory judgment [by an arbitrator] that its *interpretation* of § 9.3 is correct."). Here, although Papalote and LCRA contractually committed "to have someone—other than a judge—decide" performance-related disputes, they did not agree to have an arbitrator decide matters of contract interpretation. *In re M.W.M., Jr.*, 523 S.W.3d 203, 207 (Tex. App.—Dallas 2017).

In resisting this conclusion, LCRA heavily relies on the phrase "with respect to," which, it contends, means "relating to." LCRA argues that, because the interpretative dispute "*relat*[*es*] *to* LCRA's *ongoing and future performance* under the [Agreement]," the interpretative dispute is a dispute "with respect to" performance. However, § 9.3 is a *damages* provision, not a provision about performance, and LCRA's interpretative dispute is with respect to damages, not performance. Therefore, even if we agree with LCRA's broad reading of the phrase "with respect to," LCRA cannot prevail. Because LCRA's interpretative dispute is outside the scope of the arbitration clause, the district court erred in compelling Papalote to arbitrate.

## III.

For the foregoing reasons, we REVERSE the district court's order compelling arbitration and REMAND for further proceedings consistent with this opinion.

---

not avoid observing that LCRA's dispute "concerns the proper *interpretation* of a clause in the [Agreement]." Thus, even though LCRA may contend that it has raised a performance-related dispute, those who have examined its dispute have unavoidably characterized this as an interpretative one. *See Tidelands Marine Serv. v. Patterson*, 719 F.2d 126, 128 n.3 (5th Cir. 1983) ("That which looks like a duck, walks like a duck, and quacks like a duck will be treated as a duck even though some would insist upon calling it a chicken.").