# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 16, 2021

Lyle W. Cayce
Clerk

No. 19-50850

PAPALOTE CREEK II, L.L.C., formerly known as Papalote Creek Windfarm II, L.L.C.,

      Plaintiff - Appellant

v.

LOWER COLORADO RIVER AUTHORITY,

      Defendant - Appellee

******************************************************************************

LOWER COLORADO RIVER AUTHORITY,

      Plaintiff - Appellee

v.

PAPALOTE CREEK II, L.L.C., formerly known as Papalote Creek Windfarm II, L.L.C.,

      Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:16-CV-1097
USDC No. 1:19-CV-284

Before DENNIS, ELROD, and COSTA, Circuit Judges.

No. 19-50850

PER CURIAM:*

This appeal concerns the proper interpretation of the long-term Power Purchase Agreement (PPA) between the parties and its provisions limiting the parties' liability and damages in the event of breach of the agreement. This Court has twice before reversed district court orders compelling arbitration of the parties' underlying disputes. First, this court held that the district court lacked jurisdiction to order arbitration of the question because at that time there was no dispute ripe for adjudication. *See Lower Colo. River Auth. v. Papalote Creek II, L.L.C.* (*Papalote I*), 858 F.3d 916 (5th Cir. 2017). Next, this court held that the parties' underlying dispute did not fall within the scope of the PPA's narrow arbitration clause. *Papalote Creek II, L.L.C. v. Lower Colo. River Auth.* (*Papalote II*), 918 F.3d 450 (5th Cir. 2019). In this appeal, we are called upon to decide whether, in a third action by the Lower Colorado River Authority (LCRA) seeking a declaratory judgment, the district court erred in interpreting the PPA and its key provisions to limit to $60 million LCRA's liability for damages for failure to perform its material obligations under the agreement. We see no reversible error in the district court's contractual interpretation and summary judgment rulings. Therefore, we AFFIRM the district court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The previous panels of this court, in *Papalote I* and *Papalote II*, described the factual and procedural background of these cases, in pertinent parts, as follows:

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 19-50850

"Plaintiff–Appellee [LCRA] is a conservation and reclamation district based in Austin, Texas, and a political subdivision of the State of Texas. LCRA sells wholesale electric power to municipal-owned utilities and electric cooperatives in Texas. In December 2009, LCRA entered into [the PPA] with Defendant–Appellant Papalote Creek Wind Farm II, L.L.C. (Papalote), a Delaware limited liability company that builds and operates wind farms. Papalote planned to build an 87-turbine wind farm in Texas, and under the PPA, LCRA agreed to purchase all of the energy generated by the Project at a fixed price for an 18-year term.

. . . .

Papalote completed construction of the [wind farm] in 2010, and in the ensuing years, LCRA complied with its obligations under the PPA by purchasing all of the energy generated by the Project. In April 2015, however, LCRA initiated discussions with Papalote regarding the PPA. Although the parties dispute the precise nature of these discussions, neither party appears to have threatened to breach the PPA. Ultimately, in June 2015, LCRA sent Papalote a letter stating that, pursuant to § 13.2, LCRA was initiating the arbitration process to resolve the dispute between LCRA and Papalote regarding LCRA's limitation of liability under the PPA and its impact on LCRA's performance obligations. LCRA also noted that it intend[ed] to continue to fully perform its obligations under the PPA during the arbitration process. After Papalote requested more information about the purported dispute, LCRA sent another letter explaining that the dispute was whether LCRA's liability is limited to $60,000,000 under the PPA.

. . . .

On October 10, 2016, LCRA notified Papalote that it would cease taking energy under the PPA beginning on October 12, 2016, and that its resulting liquidated damages would be capped at $60 million per § 9.3." *Papalote I*, 858

F.3d at 918–21 (internal quotation marks and alterations omitted). After extensive litigation over whether this matter should be arbitrated, we ruled that the PPA's arbitration provision did not cover this dispute. *See Papalote II*, 918 F.3d at 456–57.

In March 2019, LCRA filed suit in the federal district court seeking declaratory judgment that its aggregate liability under the PPA is capped at $60 million. The district court consolidated that suit with the case the *Papalote II* panel remanded for further proceedings, heard oral arguments, and proceeded to consider the merits of the parties' claims and cross-motions for summary judgment. On August 26, 2019, the district court denied Papalote's motion for summary judgment and granted LCRA's cross-motion for summary judgment. The district court concluded that the last sentence of Section 9.3 of the PPA was unambiguous and subject to only one reasonable interpretation, viz., that the PPA limits to $60 million the aggregate damages that LCRA must pay to Papalote for LCRA's failure to perform its material obligations under the PPA; that section 9.4 of the PPA did not affect the application of section 9.3; and that the liquidated damages paid thus far by LCRA counted toward the $60 million cap established by section 9.3.

After carefully considering the 48-page PPA, the oral and written arguments of the parties, the record in this case, and the written reasons of the district court, we are so thoroughly persuaded that the district court's interpretation of the PPA and its application to this case are correct, that we set forth and adopt as our own the two most pertinent sections of the district court's written reasons:

No. 19-50850

## II. CONTRACT PROVISIONS[1]

The Agreement contains several provisions concerning the damages and remedies in the event of a breach by either party. For starters, the Agreement provides for liquidated damages. Section 4.3 establishes that Papalote is entitled to liquidated damages in the event LCRA fails to take and pay for all energy produced by the wind farm. A corresponding provision, § 4.2, establishes that LCRA is likewise entitled to liquidated damages in the event Papalote breaches its obligation to deliver energy to LCRA.

In addition to liquidated damages, a non-breaching party gains access to additional remedies under § 6.2 and § 6.3 if the breaching party defaults by failing to remedy its breach in a timely fashion. In that circumstance, the non-defaulting party gains the right to terminate the Agreement and "accelerate all amounts then owing between the Parties." The non-defaulting party may also demand the defaulting party pay a Termination Payment, which is calculated according to a formula set out in § 6.3.

Finally, and of particular importance here, § 9.3 imposes some limits on aggregate liability. Because the parties' dispute hinges on the interpretation of § 9.3, the Court excerpts the provision in full:

> **9.3 Limitation on Damages for Certain Types of Failures.** Notwithstanding anything to the contrary in this Agreement, Seller's aggregate liability for (i) failure of Seller to construct the Project and/or (ii) failure of one hundred percent (100%) of the Project's Turbines to achieve the Commercial Operation Date on the Scheduled COD and/or (iii) failure of one hundred percent (100%) of the Project's Turbines to achieve the Commercial Operation Date on June 1, 2011 and/or (iv) a Termination Payment, shall be limited in the aggregate to sixty million dollars ($60,000,000). *Buyer's damages for failure to perform its material obligations under this Agreement shall likewise be limited in the aggregate to sixty million dollars* ($60,000,000).

---

[1] This section is quoted verbatim from the district court's opinion.

(emphasis added).

## III. CONTRACT INTERPRETATION[2]

When construing contracts, Texas courts look first to the language of the parties' agreement. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 478–80 (Tex. 2019). If the text of a contractual provision can be given a "certain or definite legal meaning or interpretation," then that provision is unambiguous and can be construed by the court as a matter of law without the aid of extraneous evidence. *Id.* at 479. To determine whether a contractual provision is ambiguous, the court must look at the language in dispute and interpret the words used according to their "plain, ordinary, and generally accepted meaning." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019) (citation and quotation marks omitted). However, when interpreting and assigning meaning to the terms used by the parties, the court must also consider the context provided by the provision at issue and the contract as a whole. *See id.* ("Contract terms cannot be viewed in isolation[ ] . . . because doing so distorts meaning.").

As noted above, the parties' disagreement hinges on the meaning and application of the last sentence of § 9.3, which states that "[LCRA's] damages for failure to perform its material obligations under this Agreement shall likewise be limited in the aggregate to sixty million dollars ($60,000,000)." Within the scope of this broader interpretive disagreement, the parties specifically dispute: (1) whether the last sentence of § 9.3 purports to cap the damages LCRA might owe to Papalote for LCRA's failure to fulfill its material obligations under the Agreement; (2) whether such a cap would apply to limit damages owed by LCRA in aggregate or, conversely, whether the cap would

---

[2] This section is quoted verbatim from the district court's opinion. Only the citations and footnotes have been updated or omitted.

only limit LCRA's liability for a Termination Payment; (3) whether and to what extent a separate provision, § 9.4, conflicts with or overrides any cap imposed by § 9.3; and (4) whether liquidated damage payments voluntarily remitted by LCRA should count towards any cap imposed by § 9.3.

The Court approaches these arguments sequentially and first assesses whether § 9.3 functions to impose a cap upon damages owed by LCRA to Papalote.

## A. Does § 9.3 Purport to Limit the Damages that LCRA Owes to Papalote?

LCRA contends the last sentence of § 9.3 limits the damages that LCRA owes to Papalote in the event LCRA fails to perform its material obligations under the Agreement.  Papalote reads the disputed language differently. According to Papalote, the phrase "LCRA's damages" refers to damages that LCRA would be entitled to receive if LCRA failed to perform its material obligations.  Thus, under Papalote's preferred interpretation, the last sentence of § 9.3 caps the damages that LCRA can receive for its own breach of contract and, correspondingly, does *not* cap the damages that LCRA would owe to Papalote for breach of contract.  Papalote tacitly acknowledges its interpretation of the disputed language makes no sense—why would LCRA be entitled to receive damages for its own contractual breach?—but nevertheless contends the Court must adopt its interpretation because, in Papalote's view, its preferred construction represents the only conceivable interpretation of the phrase "LCRA's damages."

Black's Law Dictionary defines "damages" as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." *Damages*, BLACK'S LAW DICTIONARY (11th ed. 2019).  This definition does not clear up the interpretative dispute at issue here, which is how to interpret the phrase "LCRA's damages."  On the one hand, and when viewed in isolation, "LCRA's

damages" might be read to refer to money claimed by LCRA "as compensation for loss or injury." On the other hand, "LCRA's damages" might also be read to refer to money "claimed by, or ordered to be paid to" Papalote *by* LCRA.

Papalote insists the phrase "[LCRA's] damages" can only refer to damages that LCRA is entitled to receive, and admittedly, Papalote's preferred reading is perhaps the most common way to read the phrase "[LCRA's] damages." But it is not the only possible reading. Indeed, LCRA has cited many legal opinions which use the phrase "so-and-so's damages" to refer to the damages owed by that person to someone else. *See, e.g.*, *Ruppert v. Alliant Energy Cash Balance Pension Plan*, 726 F.3d 936, 940 (7th Cir. 2013) (recounting defendant's efforts "to moot the lawsuit and by doing so reduce the defendant's damages"); *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 552 (10th Cir. 1999) (considering whether jury should have been instructed "that defendant's damages could be limited based on events that took place after [plaintiff's] termination"); *Fisher v. First Stamford Bank & Trust Co.*, 751 F.2d 519, 524 (2d Cir. 1984) (noting jury normally determines whether plaintiff "could have mitigated defendant's damages"). If the Court were forced to read the phrase "[LCRA's] damages" in isolation, that phrase would be ambiguous because—in isolation—the phrase is susceptible of two divergent yet reasonable readings.

However, when interpreting and assigning meaning to the words used by the parties, the court must also consider the context provided by the rest of the contractual provision as well as the contract as a whole. *Pathfinder*, 574 S.W.3d at 889. Here, the context provided by the rest of the sentence demonstrates the phrase "[LCRA's] damages" is susceptible of only one reasonable interpretation. Under LCRA's preferred reading, the phrase refers to damages that LCRA would owe to Papalote in the event that LCRA "fail[ed] to perform its material obligations" under the Agreement. That reading of the

phrase "LCRA's damages" makes sense in the context in which it appears. Conversely, under Papalote's preferred reading, the phrase refers to damages that LCRA would receive for failing to perform *its own* material obligations. That makes no sense at all, because in the event that LCRA breached its material obligations, Papalote would be the party entitled to receive damages, not LCRA.

In sum, the phrase "[LCRA's] damages" is susceptible of two reasonable interpretations when viewed in isolation. Because only LCRA's reading of "[LCRA's] damages" makes any sense when that phrase is read in the context of the sentence in which it appears, the Court concludes that the phrase "[LCRA's] damages" is unambiguous and that it refers to damages that LCRA would owe to Papalote in the event LCRA failed to fulfill its material obligations under the Agreement.

## B. Does § 9.3 Only Limit LCRA's Liability for a Termination Payment?

Since the Court concludes § 9.3 caps the damages that LCRA might owe to Papalote, the Court now turns to assess the manner in which that cap applies. Papalote contends that because the last sentence of § 9.3 states that LCRA's damages are "likewise" limited to $60 million, LCRA's damages must be limited in the same way that § 9.3 limits the damages that LCRA can receive from Papalote.

Section 9.3 limits Papalote's liability for damages in four separate scenarios. Three of these scenarios are inapplicable to LCRA because they involve liability for failure to construct or operate the wind farm. Since Papalote is the party responsible for constructing and operating the wind farm and since LCRA does not participate in either of those obligations, there is no coherent means by which LCRA's liability in such scenarios might be "likewise" limited.

No. 19-50850

The fourth scenario delineated by § 9.3 concerns Papalote's liability for a Termination Payment. Papalote contends that by "likewise" limiting LCRA's damages, the last sentence of § 9.3 similarly limits LCRA's liability for a Termination Payment, but not for liquidated damages due under § 4.3.

There are two problems with Papalote's proposed reading of "likewise." First, it doesn't make a lot of sense. Of the four ways in which § 9.3 cabins Papalote's liability for damages, only one could possibly apply to LCRA. Second, and even more saliently, Papalote's reading would require ignoring the fact that § 9.3 explicitly limits LCRA's "damages *for failure to perform its material obligations.*" (emphasis added). Papalote's preferred reading elides this limitation and instead rewrites the last sentence of § 9.3 so that it limits LCRA's damages "for a Termination Payment" instead. But as Papalote has repeatedly pointed out, this Court is constrained to interpreting the language of the Agreement as written—it cannot rewrite the last sentence of § 9.3 to impose the narrower liability limitation that Papalote would prefer.

Papalote protests that if the Court reads § 9.3 to limit LCRA's liability "for failure to perform its material obligations," then the word "likewise" will have no meaning and will be rendered surplusage. The Court disagrees. "Likewise" cannot reasonably be interpreted to mean that LCRA's liability for damages is only limited with respect to a Termination Payment. "Likewise" can, however, be reasonably interpreted to mean that just as Papalote's liability is limited in certain circumstances to $60 million, LCRA's damages owed to Papalote for failure to perform its material obligations are also limited in the aggregate to $60 million. Under this reading, the word "likewise" simply means "also."

The Court thus concludes the last sentence of § 9.3 means what it says and serves to limit the aggregate damages owed by LCRA to Papalote "for

10

[LCRA's] failure to perform its material obligations" and not just for a Termination Payment.

### C. Does § 9.4 Conflict with or Override § 9.3?

Papalote next argues § 9.4 conflicts with and overrides § 9.3 for purposes of calculating LCRA's liquidated damages under § 4.3.  In relevant part, § 9.4 states that "for any provision for which an express and exclusive remedy or measure of damages is provided, such express remedy or measure of damages shall be the sole and exclusive remedy, [and] the obligor's liability shall be limited as set forth in such provision[.]"  Papalote contends that because § 9.4 states "liability shall be limited as set forth" in provisions setting forth exclusive remedies, liability limitations appearing in other provisions—such as § 9.3—are ineffective.

The problem with this argument is that § 9.4 does not explicitly state liability shall be limited solely as set forth in provisions establishing exclusive remedies.  Papalote implies the Court should insert the word "solely" into § 9.4, so that it would then read: "[T]he obligor's liability shall be limited *solely* as set forth" in any provision providing "an express or exclusive remedy or measure of damages."  (hypothetical insertion in italics).  But the Court eschews such an interpretation here because "Texas law generally mandates that one contract provision not be interpreted in a way that nullifies another provision." *Greater Hous. Radiation Oncology, P.A. v. Sadler Clinic Ass'n, P.A.*, 384 S.W.3d 875, 886 (Tex. App. 2012).

On the other hand, § 9.3 does explicitly limit LCRA's damages.  What's more, the liability limitations contained within § 9.3 apply "[n]otwithstanding anything to the contrary in this Agreement."  For these reasons, the Court concludes that § 9.4 does not affect or nullify the liability limitations established by § 9.3.

No. 19-50850

## D. Do Voluntary Payments Count Towards the Cap?

Finally, Papalote argues that even if § 9.3 caps the aggregate damages that LCRA owes to Papalote, the cap does not take effect until LCRA "fail[s] to perform its material obligations." Papalote contends LCRA has not yet failed to perform its material obligations because, although LCRA is refusing to accept or pay for energy from Papalote, it has been making liquidated damage payments as required by § 4.3. In this vein, Papalote argues the liquidated damage payments made by LCRA thus far should not count towards the $60 million cap because they are not damages for failure to perform.

The Court rejects Papalote's argument and concludes the damages paid by LCRA under § 4.3 qualify as "damages for failure to perform its material obligations." Indeed, § 4.3 describes the payments as damages, and LCRA is paying them because it has been refusing to accept or pay for energy produced by Papalote's wind farm. In turn, accepting and paying for energy produced by the wind farm are two of LCRA's material obligation under the Agreement. Because liquidated damages payments made by LCRA constitute damages "paid for failure to perform . . . material obligations," the Court concludes those payments count towards the $60 million cap established by § 9.3.

## IV. CONCLUSION

After considering the arguments of the parties and the well-crafted opinion of our dissenting colleague, we remain persuaded by the writing and authorities set forth by the district court, and we AFFIRM its judgment for the reasons it assigns. The dissent and Papalote raise no argument that has not been considered and rejected as meritless by the district court. Their principal argument that the last sentence of § 9.3 of the PPA, which caps LCRA's aggregate damages at $60 million, has been nullified by other provisions of the PPA, violates the principle of Texas law that "generally mandates that one

No. 19-50850

contract provision not be interpreted in a way that nullifies another provision."

*Greater Hous. Radiation Oncology, P.A.,* 384 S.W.3d at 886.

\* \* \*

For these reasons, the judgment of the district court is AFFIRMED.

No. 19-50850

JENNIFER WALKER ELROD, *Circuit Judge*, dissenting:

Papalote Creek II, L.L.C. invested hundreds of millions of dollars to construct a massive wind farm, relying on the Lower Colorado River Authority's eighteen-year commitment to purchase the farm's entire output of wind energy. To enforce the obligation to purchase the farm's output at the contract price, even when the market price of electricity falls below the contract price, Section 4.3 of the Power Purchase Agreement requires LCRA to either take the full output or pay a penalty of liquidated damages on the difference.[1] Under Section 4.3, then, LCRA has two options to perform on the contract: take or pay.

The contract also includes, in Sections 6.1 through 6.3, a termination provision that either party can invoke should the other default on its performance. Section 9.3, in addition to limiting Papalote's liability for three other specific, inapplicable situations, limits Papalote's liability for a termination payment to $60 million. Section 9.3 then goes on to say, "Buyer[ LCRA]'s *damages* for failure to perform its material obligations under this Agreement shall likewise be limited in the aggregate to sixty million dollars."

On its face, the quoted sentence from Section 9.3 makes no sense: the Buyer, LCRA, cannot be awarded damages for its own failure to perform. Indeed, at arbitration, LCRA argued that the sentence was simply a mistake introduced in the final stages of drafting. Before the district court and this court, however, LCRA insists that there is no mistake and no problem because "Buyer's damages" really means "Buyer's liabilities," *i.e.*, the damages that LCRA owes to Papalote. LCRA then claims that Section 9.3 limits the

---

[1] The contract imposes, in Section 4.2, a corresponding obligation on Papalote to either provide the whole output of the farm or pay a penalty to LCRA.

14

aggregate damages—including LCRA's Section 4.3 payments as "liquidated damages"—to $60 million. The majority and the district court agreed. *But see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 134 (2012) ("To give meaning to what is meaningless is to create a text rather than to interpret one.").

While reading "damages" to mean "liability" is itself a stretch, the bigger problem lies in reading Section 9.3 to supersede and nullify Section 4.3. Properly construed, the payment of liquidated damages under Section 4.3 constitutes performance on the contract, not termination of the contract— LCRA did not breach the contract and incur liability until it stopped making its Section 4.3 payments. Until that point, Section 4.3 defines the "sole and exclusive" remedy for failure to take. We know this because Section 9.4 of the contract says so. Section 9.4 also says that "the obligor's liability shall be limited as set forth in such provision [*i.e.*, Section 4.3]." Section 9.4 thus tells us that if there is a limitation to LCRA's aggregate payments under Section 4.3, that limitation must come from Section 4.3 itself. Grafting an irrelevant liability limitation from Section 9.3 onto Section 4.3—as the majority opinion does—brings Sections 9.3 and 9.4 into unnecessary conflict.

By nevertheless including LCRA's Section 4.3 payments in a $60-million cap under Section 9.3, the majority gives LCRA a $60-million option to back out of the contract at any time, for any reason. That reading renders Sections 4.3 and 9.4 surplusage and, in doing so, materially alters the purchase contract in a way that makes no sense. Papalote expended hundreds of millions of dollars to construct a massive windfarm, and yet LCRA can buy its way out for $60 million? Read on its own terms and in light of the contract as a whole, Section 9.3 imposes no such liability limitation. *See URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 770 (Tex. 2018) ("[C]ourts cannot rewrite the parties' contract or add to or subtract from its language." (quoting *Fischer v. CTMI, L.L.C.*, 479

No. 19-50850

S.W.3d 231, 242 (Tex. 2016))); *Fischer*, 479 S.W.3d at 239 (stating that courts may not "consider only the parts [of a contract] favoring one party and disregard the remainder" (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005))).

Because I believe that the majority incorrectly interprets Section 9.3 to cap LCRA's payments for liquidated damages under Section 4.3, in contravention of Section 9.4, I dissent.[2]

---

[2] As I would hold that Section 9.3 does not impose a cap on Section 4.3 payments, I would not reach the issue of whether voluntary Section 4.3 payments should count towards that cap. If I were to reach that issue, I would hold that they do not and therefore should not be deducted from the cap.